**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Wiley Y. Daniel**

Civil Action No.   05-cv-00078-WYD-CBS

DAVID HAWTHORNE,

     Plaintiff,

v.

JON BALDWIN,

     Defendant.

_____

**Findings of Fact, Conclusions of Law, and Order**
_____

     This matter was tried to the Court on August 8, 9, and 10, 2006.  The Plaintiff, David Hawthorne, was represented by Ian Kalmanowitz, Cornish and Dell'Olio; the Defendant, Jon Baldwin, was represented by Michael Waters, Jones and Waters.  After consideration of the testimony of the witnesses, the exhibits submitted, the statute, applicable regulations and the arguments of counsel the Court enters the following findings of fact and conclusions of law.

**Findings of Fact**

**The Parties**

David Hawthorne

1.    The Plaintiff, David Hawthorne, is a natural person.  He resides in El Paso County, Colorado.

2.    David Hawthorne is 48 years old.  He has not achieved a high school education.

3.      He testified that he has in the past been employed as a heavy equipment operator, a janitor and a welder. He has worked as a heavy equipment operator since the early 1970's.

4.      In 2003, David Hawthorne was hired by Baldwin Demolition, Inc. as an equipment operator. He was employed as an equipment operator by Baldwin Demolition, Inc. from August 18, 2003, until January 4, 2005. David Hawthorne also worked for Baldwin Demolition, Inc. from May 31, 2005, to July 5, 2005, on a Penrose Hospital demolition project, pursuant to a stipulation in this case.

5.      In 2003, David Hawthorne was hired by Baldwin Demolition, Inc. at a rate of pay of $15.00 per hour, his pay was later raised to $16.00 per hour and later to $18.00 per hour.

6.      After several months of employment with Baldwin Demolition, Inc. David Hawthorne purchased a welder and a truck. He performed welding for Baldwin Demolition, Inc. using his welder; he also performed general labor for Baldwin Demolition, Inc. throughout his employment and until December 2, 2004.

### Jon Baldwin

7.      Jon Baldwin was at times relevant to the Complaint the sole owner of Baldwin Demolition, Inc., a demolition company operating in El Paso County, Colorado.

8.      Baldwin Demolition, Inc. is a Colorado Corporation with more than $500,000.00 per year in gross receipts.

9.      Jon Baldwin managed the business of Baldwin Demolition, Inc., including hiring, firing and disciplining employees, creating all financial records for the company, including payroll records, supervising work sites, determining rates of pay and duties to be performed by employees, including the number of hours to be worked by employees. He determined whether non-exempt employees were paid time and a half

for hours worked over forty in a single work week as required by the federal Fair Labor Standards Act.

### Baldwin's Pay Plan

10.     Approximately three months after David Hawthorne began to work for Baldwin Demolition, Inc., Jon Baldwin approached David Hawthorne and informed him that he wanted to "bank" David Hawthorne's overtime hours.  Jon Baldwin told David Hawthorne that he would "bank" his overtime hours and pay him for those hours at a later time.  David Hawthorne did not object.

11.     Several months later Jon Baldwin gave David Hawthorne the first of several checks made payable to David Hawthorne from Colorado Industrial Recycling, Inc. as payment for the Plaintiff's overtime hours at a straight time rate.  These checks, also referred to at trial as the "Koscove checks" were signed by the owners of Colorado Industrial Recycling, Inc., the Koscoves.  *See* Ex. 15.

12.     David Hawthorne never performed any work for Colorado Industrial Recycling, Inc.

13.     Jon Baldwin had arranged with a company known as Colorado Industrial Recycling, Inc. to have money which was owed to Baldwin Demolition, Inc. for scrap materials paid directly to employees of Baldwin Demolition, Inc. as compensation for hours worked for Baldwin Demolition, Inc.  These checks were paid at straight time, not at the overtime rate of one and one half times the employee's regular rate of pay. F.I.C.A. and payroll taxes were not withheld from these Colorado Industrial Recycling, Inc. checks and the amounts paid were not included as wages reported to the federal government by Baldwin Demolition, Inc. or Colorado Industrial Recycling, Inc. Colorado Industrial Recycling did not report the checks to the federal government or the State of Colorado as wages or other compensation.  David Hawthorne received

checks for $1,282.00, $540.00, $1450.00, $600.00, $2,000.00 and $1,000.00 as payment in part for banked overtime.

14. At trial, the Defendant admitted that his pay plan of paying employees through Colorado Industrial Recycling violated the law.

### Hawthorne's Hours and Pay

15. From December 2003 through November 2004 Baldwin Demolition, Inc. provided David Hawthorne with 40 or more hours each work week for 41 of 52 work weeks. In addition, most work weeks he worked overtime. He was paid for his overtime work at his straight time rate. On average, in that one year period, David Hawthorne was provided with at least 40 hours of work per week.

16. Beginning in March, 2004, David Hawthorne received a regular paycheck from Baldwin Demolition, Inc. for $720.00, which represented payment at $18.00 per hour, for equipment operating and general labor and for welding.

17. Payroll taxes were withheld from these $720.00 checks.

### Hawthorne's Concern About the Pay Plan and His Complaints

18. In the fall of 2004, David Hawthorne began to be concerned about the pay arrangement and inquired of another employee, Tom Campbell, how he, Campbell, paid his taxes on the Colorado Industrial Recycling, Inc. checks. Campbell and another longtime employee, Richard "Hank" Harfert, had received similar payments in 2004 and in prior years and had not paid taxes on those checks.

19. Campbell interpreted Hawthorne's query to be a complaint and reported the conversation to Jon Baldwin.

20. In November 2004, Jon Baldwin approached Hawthorne at a job site and asked Hawthorne if he had been talking to Tom Campbell about the overtime checks and taxes. David Hawthorne admitted he had. At that time Baldwin and Hawthorne had a

conversation about the Colorado Industrial Recycling, Inc. checks as they sat in Baldwin's truck. Baldwin advised Hawthorne that he (Hawthorne) should claim that he was self employed and declare the Colorado Industrial Recycling checks as income from the self employment. Baldwin also informed Hawthorne to seek outside advice if he was concerned about the pay plan.

21.  In November, 2004, David Hawthorne consulted a lawyer about the Baldwin pay plan.

22.  On November 23, 2004, the lawyer made a demand on the employer by letter (Exhibit 1) for $1,367.50 in unpaid overtime compensation, $1,367.50 in liquidated damages and $250.00 in attorney's fees.

23.  On December 2, 2004, Jon Baldwin discussed the lawyer's letter with David Hawthorne. In response to the letter, Baldwin gave Hawthorne a check in the amount of $1041.50, for some but not all the unpaid overtime wages. Ex. K.

### Retaliation

24.  On December 2, 2004, David Hawthorne had completed his assigned work as an equipment operator and was performing general labor for Baldwin at an interior demolition site at Grace Church in downtown Colorado Springs.

25.  It was customary for Hawthorne to perform general labor when he completed his assigned work as an equipment operator. He performed general labor with the knowledge and consent of Jon Baldwin in order to work a full 40 hour work week when there were not 40 hours of work available as an equipment operator.

26.  On December 2, 2004, there was general labor work available at the demolition site at Grace Church. The job at Grace Church was not completed for at least one week after December 2, 2004.

27.  When Jon Baldwin arrived at the demolition site at Grace Church on December

2, 2004, where David Hawthorne was working, he was angry and had a piece of paper in his hand which appeared to David Hawthorne to be a letter.

28.     Jon Baldwin sent David Hawthorne home and told him not to return to work the next day.  At the time Hawthorne was sent home, Baldwin told him that he wouldn't pay liquidated damages or attorney's fees and that he wouldn't be working interior demolition any more.  Jon Baldwin had never before sent David Hawthorne home early when there was work available.

29.     On December 2, 2004, after being sent home and told not to return to work the following day, David Hawthorne made a complaint in writing, through an attorney, to the United States Department of Labor, Denver District Office, concerning the practice of Baldwin Demolition, Inc. of failing to pay overtime wages at the rate required by the Act.

30.     Jon Baldwin testified at trial that Richard "Hank" Harfert had the authority to bar workers from performing interior demolition and that Harfert had asked Baldwin to bar Hawthorne from performing interior demolition.  Baldwin further testified that it was Harfert's decision to send David Hawthorne home early and to not allow him to perform general labor at the demolition site at Grace Church.

31.     Richard "Hank" Harfert testified that he did not know that David Hawthorne had been sent home on December 2, 2004, until after Hawthorne had left.  Harfert testified that he had never asked Jon Baldwin to keep David Hawthorne from working interior demolition.

32.     On December 3, 2004, Jon Baldwin stopped payment on the $1,041.50 check he had given to Hawthorne, and issued a check for the $2,985 demanded in the November 23, 2004, letter from Hawthorne's lawyer.  Prior to issuing the check for $2,985, Jon Baldwin received, read and understood the December 2, 2004, complaint to the Department of Labor about Baldwin Demolition's questionable pay practices.

33.     In the weeks that followed the December 2, 2004, complaint to the Department of Labor, David Hawthorne was barred from performing general labor for Baldwin Demolition, Inc. and his hours were cut.  He was sent home when there was work available to be performed and told by Jon Baldwin not to report for work.

34.     During the week of November 29, 2004, Hawthorne's hours were cut to 30.  During the week of December 6, 2004, Hawthorne's hours were cut to 14 ½.  During the week of December 13, 2004, Hawthorne's hours were cut to 18 ½.  During the week of December 20, 2004, Hawthorne's hours were cut to 24 ½.  During the week of December 27, 2004, Hawthorne's hours were cut to 36.

35.     During the period of time described above, Jon Baldwin hired two other equipment operators.

36.     On December 6, 2004, and December 27, 2004, Jon Baldwin received letters from David Hawthorne's lawyer which provided notice to him that it was illegal to retaliate against a worker who complained about not being paid overtime.

37.     Jon Baldwin's written response (Ex. 5) was that David Hawthorne had been hired as an equipment operator and that "Hank told me Thursday that he didn't need you." Ex. 5.  He noted that it was "impossible" to give every full time employee 40 hours of work and noted that 4 other workers worked fewer than 40 hours in the weeks prior to December 2, 2004.

38.     In December, 2004, Jon Baldwin hired two equipment operators.

39.     On January 4, 2005, Jon Baldwin terminated David Hawthorne's employment.  The reason given was that he couldn't guarantee Hawthorne 40 hours a week as an equipment operator and he interpreted the lawyer's letter as a demand that Hawthorne work 40 hours a week as an equipment operator.

40.     The lawyer's letters do not demand that David Hawthorne work only as an

equipment operator and cannot reasonably be interpreted to make such a demand.

41.     The December 27, 2004, letter (Ex. 6), states:

>   We would like to give you an opportunity to pay Mr. Hawthorne for the wages he has lost as a result of reducing his hours after his complaint to the United States Department of Labor.
>
>   If you would like to take corrective action you can avoid a lawsuit in Federal District Court in Denver.
>
>   If we are required to file a lawsuit in order to recover these wages I will ask the federal judge to award my firm its fees at $200.00 an hour.
>
>   I hope you choose to get advice from a lawyer before we file a lawsuit.

42.     Jon Baldwin's response to this letter is found at Exhibit 7. Baldwin explains that Hawthorne's hours were cut because Harfert did not want Hawthorne working interior demolition and that employees could not be guaranteed 40 hours of work each week.

43.     Baldwin repeatedly testified that the reason Hawthorne was terminated was that Hawthorne's lawyer never answered Baldwin's question about being required to pay Hawthorne for 40 hours of work even if there were not 40 hours of work in a week.

44.     Prior to December 3, 2004, Baldwin provided Hawthorne with three types of work: exterior or full demolition, interior demolition, and welding. The combination of these three types of work provided enough work to get Hawthorne 40 hours of work per week.

45.     In December, 2004, and January, 2005, Baldwin Demolition, Inc. had several demolition jobs in progress which David Hawthorne could have worked on. Baldwin testified that there was plenty of work available after January 4, 2005, and that the two equipment operators hired to replace Hawthorne did not perform as well as Hawthorne had performed. David Hawthorne's hours were not cut and Hawthorne was not terminated for "lack of work." Jon Baldwin testified that he liked David Hawthorne, that Hawthorne was his best equipment operator, and that he wanted to return Hawthorne

to work, but could not do so until he received an answer to his question to the lawyer.

46.     Baldwin testified that if Hawthorne had not been terminated he would have worked at least 40 hours/week in every week from January, 2005, through his second termination in July, 2005.

47.     In May, 2005, Hawthorne was returned to work by Baldwin Demolition, Inc. pursuant to an informal agreement between the parties. He was again involuntarily terminated in early July, 2005, the reason given for the second termination was lack of work. Prior to the second termination, Hawthorne's hours were reduced.

48.     There was sufficient work available for Hawthorne to continue working 40 hours/week until July 31, 2005.

## Ultimate Facts

49.     David Hawthorne was sent home from work on December 2, 2004, in retaliation for his November 23, 2004, complaint for unpaid overtime wages.

50.     Between December 2, 2004, and January 4, 2005 David Hawthorne was barred from performing general labor for Baldwin Demolition, Inc. by Jon Baldwin in retaliation for his complaint for unpaid overtime wages and his December 2, 2004, complaint to the United States Department of Labor and in retaliation for his lawyer's demands dated December 6 and December 27, 2004, that Jon Baldwin stop retaliating against David Hawthorne.

51.     The reasons advanced at trial by the employer for the adverse employment action were not credible. The employer's claim that he was merely fulfilling the personal preference of Hank Harfert that David Hawthorne be barred from performing general labor was not believable. Hank Harfert testified specifically that he had never asked Baldwin to bar Hawthorne from performing interior demolition. Hank Harfert, in fact, permitted David Hawthorne to work with him at Grace Church and never

mentioned it to David Hawthorne or gave any indication to David Hawthorne that he objected to working with him.  These facts suggest that Hank Harfert's preferences were not the real motivation for Jon Baldwin's actions on December 2, 2004.  The fact that the employer mentioned the compensation for overtime at the time he sent David Hawthorne home was further evidence that retaliation for complaining about unpaid overtime and complaining to the Department of Labor were the motivating factors for the adverse action.  The employer's failure to mention Hank Harfert's alleged personal preferences in the days and letters that followed, Harfert's failure to provide testimony tp support the claim that he preferred that Hawthorne not work interior demolition, and the references to availability of work in the letters that followed was further evidence of pretext.

52.     On January 4, 2005, David Hawthorne was discharged from his employment with Baldwin Demolition, Inc. by Jon Baldwin for the protected activities described in paragraph 44.

53.     Jon Baldwin testified that if he had never received any letters from Hawthorne's lawyer, Hawthorne would still be working for him.

### Hawthorne's Damages

54.     As a direct and proximate result of the discrimination and discharge described above David Hawthorne lost income and suffered emotional distress.

55.     From December 2, 2004, through December 25, 2004, David Hawthorne's hours were cut in retaliation for his complaints.  The Plaintiff is entitled to lost wages during this period.

56.     Based on the evidence presented at trial, the Court finds as a matter of just and reasonable inference, that but for the retaliation against him, David Hawthorne would have worked the following hours:

- In the week ending December 4, 2004, Plaintiff would have worked an additional 10 hours.
- In the week ending December 11, 2004, Plaintiff would have worked an additional 20 ½ hours.
- In the week ending December 18, 2004, Plaintiff would have worked an additional 18 ½ hours.
- In the week ending December 25, 2004, Plaintiff would have worked an additional 12 ½ hours.

57.   Plaintiff would have been paid at his regular $18/hour rate of pay for those hours that but for the retaliation he would have worked between December 2, 2004, and December 25, 2004.  Plaintiff is entitled to receive those lost wages.

58.   Based on the uncontroverted evidence, the Court finds that but for the retaliation, Plaintiff would have worked 40 hours/week for Defendant from the beginning of January, 2005, through May 31, 2005.  The Court finds that the only reason Plaintiff did not work during that period is because of the retaliation against him by Defendant for his protected activity.

59.   The Court finds that Plaintiff is entitled to lost wages during the period of January, 2005, through May 31, 2005, minus any interim earnings from other sources of employment.

60.   The Court also finds that absent any retaliatory animus toward the Plaintiff, he would have worked 40 hours/week in each of the weeks he was re-employed by Defendant on the "Penrose job."  Accordingly, Plaintiff is entitled to lost wages for the difference between all hours worked and the 40 hours available to be worked in any of the weeks in June and July 2005, minus any interim earnings from other sources of employment.

61.     Plaintiff made appropriate and reasonable efforts to mitigate his damages by seeking suitable employment as a welder or equipment operator with a number of employers in Colorado Springs, Pueblo, Canon City, Penrose, and Woodland Park. Plaintiff applied for operator or welder positions with Rocky Mountain Material, Kempton Construction, LaFarge, Triple E, Ute Pass, T-Sack, Black Diamond, C&C Sand, Pioneer, Frazee, Colorado Dirt Works, TR Construction, Tab, and TRAX, as well as a number of other excavating and trash companies. After his termination from Baldwin Demolition, Plaintiff was briefly employed by Frazee before being re-employed by Baldwin Demolition. Following the second termination, Plaintiff worked for Kempton Construction before going to work for TR Construction.

62.     Any money earned from Frazee, Kempton Construction, or TR Construction between January 4, 2005, and July 31, 2005, are interim earnings that must be deducted from the wage loss described above.

63.     The Court finds that the collateral source rule, as articulated by the Colorado Court of Appeals in *TCI v. Buckley*, 844 P.2d 1249, 1253-55 (Colo. App. 1992) applies to the unemployment benefits received by Plaintiff, and that those benefits shall not be considered as interim earnings and applied to reduce Plaintiff's wage loss.

64.     29 U.S.C. § 216(b) requires an award of liquidated damages, accordingly, the total amount of Plaintiff's wage loss will be doubled as liquidated damages.

65.     The Court finds that an award of compensatory damages is authorized under the statute, and based on the evidence presented at trial, such an award is appropriate. The Court was persuaded by the testimony of Plaintiff and the testimony of Mrs. Hawthorne regarding Plaintiff's emotional distress. The Defendant's decision to not follow the law regarding pay and then retaliate against Plaintiff when he exercised his legal rights caused Plaintiff to suffer depression, loss of sleep, difficulties with his wife,

and significant changes in Mr. and Mrs. Hawthorne's relationship. The testimony of David Hawthorne and the testimony of Cindi Hawthorne support this conclusion by a preponderance of the evidence. The Court is persuaded by Plaintiff's truthful testimony that he felt like less of a man and less than a whole person because of the damage caused by the retaliation.

66. The Court finds an award of $30,000 in compensatory damages reasonable and appropriate to compensate Plaintiff for the non-economic damages he suffered as a direct result of the Defendant's unlawful retaliation.

67. In addition to the relief described above, Hawthorne is entitled to recover his costs and reasonable attorneys fees as the prevailing party in this action. 29 U.S.C. § 216(b).

68. At the conclusion of the trial of this matter, the Court ordered the parties' lawyers to meet and confer regarding the calculation of Plaintiff's wage loss and the amount of recoverable costs and reasonable attorneys fees. The parties have informed the Court that after conferring they have reached, and agreed to, the following stipulations:

    (a) Plaintiff's wage loss, calculated according to the facts contained in paragraphs 56-63 and the evidence presented at trial, is $17,873; and

    (b) Plaintiff's recoverable costs and reasonable attorneys fees total $39,254.

### Conclusions of Law

1. Baldwin Demolition, Inc. was at all times relevant to the Complaint subject to the overtime provisions of the federal Fair Labor Standards Act 29 U.S.C. § 207 and coverage was not contested in this case. *See* Answer ¶ 4.

2. David Hawthorne was a non-exempt employee under the Act and should have been paid at one and one half times his regular rate for hours worked over 40 in a single work week and the same was not contested in this case. *See* Answer ¶ 4.

3. The legislative purpose in enacting the Fair Labor Standards Act was to eliminate working conditions "detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202.  The Fair Labor Standards Act is remedial legislation which should be broadly interpreted to advance its humanitarian purposes.  *A.H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493, 89 L. Ed. 1095, 65 S. Ct. 807 (1945); *Schoenhals v. Cockrum*, 647 F.2d 1080, 1081 (10th Cir. 1981); *Welding v. Bios Corp.,* 353 F.3d 1214,1218 (10th Cir. 2004); *Shultz v. Mistletoe Express Serv., Inc.*, 434 F.2d 1267, 1270 (10th Cir. 1970).

4. A covered employer is bound by the requirements of the FLSA to pay overtime. An agreement with the employee to pay less than he is owed under the Act is unenforceable.  *Handler v. Thrasher*, 191 F.2d 120, 123 (10th Cir. 1951).  David Hawthorne's acceptance of the Colorado Industrial Recycling, Inc. checks did not affect his right to be protected from retaliation pursuant to 29 U.S.C.§ 215(a)(3).

5. The Fair Labor Standards Act prohibits employers from "discharg[ing] or in any other manner discriminat[ing] against any employee because such employee has filed any complaint . . . under or related to [the FLSA]."  29 U.S.C. § 215(a)(3).

6. A plaintiff can prove a discriminatory motive with either direct or inferential proof. An employee seeking to undo or receive damages for an adverse employment action must prove that his conduct was the "motivating factor" in the employment action against him.  *McKenzie v. Renberg's Inc.*, 94 F.3d 1478 (10th Cir. 1996).

7. Fair Labor Standards Act retaliation claims are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1206 (10th Cir. 2004).

> Under that framework, the employee must first establish a prima facie case of  retaliation.  If the employee succeeds, the employer must offer a legitimate, non-retaliatory reason for the adverse employment action.  Then,

> the burden shifts back to the employee to show [that] . . . the employer's proffered reason is unworthy of credence.

*Saville v. IBM*, 2006 U.S. App. LEXIS 15839, *6 (10th Cir. 2006)(internal quotations omitted).

8. Under the first prong of the *McDonnell Douglas* framework, the employee must establish a prima facie case of retaliation by demonstrating (1) he engaged in protected activity under FLSA, (2) he suffered an adverse employment action contemporaneous with or subsequent to the protected activity,[1] and (3) a causal connection between the protected activity and the adverse employment action. *Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1206 (10th Cir. 2004).

9. David Hawthorne engaged in a protected activity under Section 15(a)(3) of the Act when his lawyer sent a complaint for unpaid overtime to his employer on November 23, 2004, when the lawyer filed on his behalf a complaint with the United States Department of Labor on December 2, 2004, and when the lawyer asserted by letters to Jon Baldwin dated December 6, 2004, and December 27, 2004, that David Hawthorne had a right to be free of retaliation.

10. The Act protects advocacy of rights within the workplace as well as formal complaints of violations or perceived violations. The 10th Circuit has interpreted Section 15(a)(3) to include advocacy.

> Thus, it is the assertion of statutory rights (i.e. the advocacy of rights) by taking some action adverse to the company—whether via formal complaint, providing testimony in FLSA proceedings, complaining to superiors about inadequate pay, or otherwise—that is the hallmark of protected activity under 215(a)(3).

---

[1] The Supreme Court's recent change to the "adverse employment action" standard in *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (June 22, 2006) is discussed in greater detail in paragraphs 11-12; however, as discussed below, I find this distinction to be of no consequence, as it is clear that Mr. Hawthorne's reduction in hours and subsequent termination are sufficiently adverse to prove the necessary element of the prima facie case under either standard.

*McKenzie v. Renberg's Inc.*, 94 F.3d 1478,1486 (10th Cir. 1996).

11.     Actions which "take something of consequence from the employee . . . by discharging or demoting her, reducing her salary or divesting her of significant responsibilities" are generally recognized to constitute adverse employment actions in the context of a claim for unlawful retaliation under 29 U.S.C. §215(a)(3). *Blackie v. Maine*, 75 F.3d 716, 725 (1st Cir. 1996).  Recently the United States Supreme Court has broadened the second element of the prima facie case by holding that a plaintiff need only show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *Burlington Northern & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405 (June 22, 2006)(internal quotations omitted).

12.     David Hawthorne was sent home early on December 2, 2004, was told by Jon Baldwin not to report to work the next day, was barred from general labor between December 2, 2004, and January 4, 2005, and was discharged from his employment in January, 2005.  David Hawthorne lost income when he was sent home early on December 2, 2004.  He lost income when he was barred from performing manual labor between December 2, 4004, and January 4, 2005.  David Hawthorne's losses of income and the termination of his employment constitute adverse employment actions, and these actions are sufficiently adverse to chill a reasonable employee's complaints under the FLSA.

13.     A causal connection between the protected activity and the adverse employment action "may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive such as protected conduct closely followed by adverse action."
*Burrus v. United Tel. Co. of Kansas*, 683 F.2d 339, 343 (10th Cir. 1982).  Here, the first

adverse action taken by Baldwin against Hawthorne occurred on the same day that Baldwin learned of David Hawthorne's complaint to the Department of Labor. The other adverse actions all occurred over a one month period after Baldwin learned of the complaint to the Department of Labor. The close temporal proximity between the complaint and the adverse actions is sufficient to allow an inference that a causal connection existed between the complaint and the decision to terminate Hawthorne. *See Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (indicating that a period of six weeks gives rise to a rebuttable inference of a causal connection, but that a period of three months does not).

14.     In addition, comments made by Baldwin at the time he sent Hawthorne home on December 2, 2004, to the effect that he would pay back wages but wouldn't pay liquidated damages or the attorney's fees and that David Hawthorne "wasn't making friends" by hiring a lawyer or complaining about his wages are circumstantial evidence that there was a causal connection between the protected activity (the complaint to the DOL) and the adverse employment action.

15.     David Hawthorne has met his burden of proving a prima facie case of retaliation.

16.     Since David Hawthorne has proved a prima facie case of retaliation, the second prong of the *McDonnell Douglas* framework requires Baldwin to offer a legitimate, non-retaliatory reason for the adverse employment action. *Pacheco v. Whiting Farms, Inc.*, 365 F.3d 1199, 1206 (10th Cir. 2004).

17.     The Defendant has failed to provide a legitimate, non-retaliatory reason for Hawthorne's termination. Jon Baldwin admitted the ultimate issue of fact—that he terminated David Hawthorne because of the letters he received from Hawthorne's lawyer. This admission is sufficient evidence to find for Plaintiff on his claims.

18.     Baldwin's stated reasons for the adverse employment action are stated in

paragraphs 30, 37, 39, and 41.

19.     Under the third prong of *McDonnell Douglas,* the burden shifts back to the employee to provide evidence showing that the employer's proffered reason is a pretext for retaliation. *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003).

20.     A plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)(internal citations omitted).

21.     David Hawthorne has shown sufficient implausibilities, inconsistencies and contradictions in each of Baldwin's stated reasons for the adverse actions to prove by a preponderance of the evidence that those stated reasons are merely a pretext for retaliation.

22.     The Defendant's failure to assert a legitimate, non-retaliatory reason for the adverse action is sufficient grounds to find for the Plaintiff on his claims.  However, even if the reasons provided by the Defendant for the actions taken met the standard as required by *McDonnell Douglas*, the Court finds that the Defendant's stated reasons for reducing Plaintiff's hours and terminating his employment are a pretext designed to mask unlawful retaliation.

23.     David Hawthorne has proved by a preponderance of the evidence that his demand for unpaid overtime, his complaint to the Department of Labor, and his subsequent complaints of retaliation were the motivating factors in the employment actions taken against him by Baldwin.  Jon Baldwin admitted that but for David Hawthorne's complaints, his employment would not have been terminated.

24.     The Court finds that the "motivating factor" causation standard set forth by the Tenth Circuit in *McKenzie v. Renberg's Inc.* has been proved by a preponderance of the evidence.

25.     Jon Baldwin personally imposed the adverse employment actions of cutting the David Hawthorne's working hours, barring Hawthorne from certain work and discharging Hawthorne from employment.

26.     The prohibition of Section 15(a)(3) applies to "any person." The statute defines "person" to include "an individual." 29 U.S.C. § 203(a). Thus, Jon Baldwin is a person within the meaning of the Act and a proper defendant in this action.

27.     Section 16(b) of the Act includes "such legal and equitable relief as may be appropriate to effectuate the purposes of section 15(a)(3)." In *Travis v. Gary Cmty. Mental Health Ctr, Inc.*, 921 F.2d 108 (7th Cir. 1990) *cert. denied,* 502 U.S. 812, (1991) the 7th Circuit held that "this amendment authorizes 'legal' relief, a term commonly understood to include compensatory . . . damages." 921 F.2d at 111.

28.     Section 16(b) of the Fair Labor Standards Act provides that "[a]ny employer who violates the provisions of section 215(a)(3) of this title shall be liable for . . . the payment of wages lost and an additional equal amount as liquidated damages." 29 U.S.C. § 216(b).

29.     Jon Baldwin acted directly or indirectly in the interest of the employer in relation to Hawthorne by formulating and implementing the overtime policies of Baldwin Demolition, Inc. and was therefore an employer within the meaning of the Act. 29 U.S.C. § 203(d). He is a proper defendant against whom all relief requested in this action may be awarded.

### Order

It is hereby Ordered that judgment enter in favor of David Hawthorne and

against Jon Baldwin as follows:

1.   Damages for lost earnings in the amount of $17,873.

2.   Liquidated damages in the amount of $17,873.

3.   Compensatory damages for emotional distress in the amount of $30.000.00.

4.   Costs and attorneys fees in the amount of $39,254.

Dated:  September 19, 2006

BY THE COURT:

s/ Wiley Y. Daniel
Wiley Y. Daniel
U. S. District Judge